UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MAKSYM FEDONIUK,

Petitioner,

v.

WARDEN OF NORTHWEST ICE PROCESSING CENTER, *et al.*,

Respondents.

Case No. C26-2984-MLP

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Maksym Fedoniuk is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. He has filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2241 asserting that his detention violates his Fifth Amendment right to due process. (Dkt. # 1.) Petitioner submitted a declaration in support of his petition (dkt. # 1 at 5-8) and a number of supporting exhibits (dkt. # 1-1). Respondents filed a timely return to the petition (dkt. # 6), together with supporting declarations from Andre Ouk, a deportation officer with ICE's Office of Enforcement and Removal Operations ("ERO") (dkt. # 7 ("Ouk Decl.")), and Peter H. Clark, Respondents' counsel (dkt. # 8 ("Clark Decl.")). Petitioner filed a timely reply to Respondents' return. (Dkt. # 9.) The Court having reviewed the parties' submissions and the governing law,

GRANTS Petitioner's habeas petition (dkt. # 1), and ORDERS that he be released from custody.[1]

## I. BACKGROUND

Petitioner is a native and citizen of Ukraine who entered the United States at Sea-Tac International Airport on August 29, 2024, and was subsequently paroled into the country under the Ukrainian Humanitarian Parole ("UHP") program. (Dkt. # 1 at 5; Ouk Decl., ¶ 6.) Petitioner was granted temporary parole until August 28, 2026. (*See id.*; dkt. # 1-1 at 11-13.)

On June 26, 2025, Petitioner submitted an Application for Asylum and for Withholding of Removal (Form I-589) to U.S. Citizenship and Immigration Services ("USCIS"), and that application remains pending at this time. (Dkt. # 1 at 5; dkt. # 1-1 at 15-16; Ouk Decl., ¶ 7.) On June 12, 2026, Petitioner submitted an Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131) requesting a new period of parole under the Re-Parole Process for Certain Ukrainian Citizens and Their Immediate Family Members. (*See* dkt. # 1 at 6; dkt. # 1-1 at 19; Ouk Decl., ¶ 8.) Petitioner was thereafter scheduled for a biometrics appointment related to his application for re-parole at the Seattle USCIS office on August 13, 2026.[2] (Dkt. # 1 at 6; dkt. # 1-1 at 20-21.)

On August 3, 2026, immigration officers were advised of Petitioner's August 13th appointment at the USCIS office, which caused them to review Petitioner's Department of

[1] The parties consented to proceed before the undersigned Magistrate Judge. (Dkt. # 5.)

[2] The Record of Deportable/Inadmissible Alien (Form I-213) prepared by immigration officers in conjunction with Petitioner's arrest in August 2026 indicates that Petitioner was granted an extension of his UHP status on July 8, 2026, and that his parole was extended until January 7, 2028. (*See* dkt. # 1-1 at 9.) There is no other documentation in the record reflecting this purported extension and this detail is inconsistent with Petitioner's documentation showing that he was scheduled for a biometrics appointment related to his application for re-parole on August 13, 2026. (*See id.* at 20.) However, this factual issue need not be resolved as it is not relevant to the ultimate disposition of this action.

Homeland Security ("DHS") records. (Dkt. # 1-1 at 9; Ouk Decl., ¶ 9.) This, in turn, led them to conclude that Petitioner had no current lawful status in the United States. (*Id.*) Thus, when Petitioner appeared for his appointment with USCIS on August 13, 2026, immigration officers took him into custody. (Dkt. # 1 at 6; dkt. # 1-1 at 5-6, 9; Ouk Decl., ¶ 11.) On the same date, DHS issued a Notice to Appear ("NTA") charging Petitioner as removable under Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I). (Dkt. # 1-1 at 1-4; Ouk Decl., ¶ 12.) Petitioner was thereafter transported to NWIPC, where he remains detained. (Dkt. # 1-1 at 8.) According to Petitioner, he did not receive copies of the documents relating to his arrest, including the NTA, until August 17, 2026. (Dkt. # 1 at 6; *see also* dkt. # 9 at 5.)

On August 14, 2026, ERO issued a parole termination notice advising Petitioner that his parole had been terminated effective August 13, 2026. (Ouk Decl., ¶ 13; Clark Decl., Ex. B.) According to the notice, the reason for termination was that ICE had determined it was "prudent to have [Petitioner's] case heard before the Executive Office of Immigration Review," *i.e.*, before an immigration judge ("IJ"). (*Id.*)

At some unspecified point in time, ERO discovered an Interpol Red Notice had been issued for Petitioner, indicating that he is a fugitive wanted for prosecution by Ukraine. (*See* Ouk Decl., ¶ 10; Clark Decl., Ex. A.) The Red Notice was issued on August 29, 2025, and alleges that in March 2018, Petitioner was the driver in a vehicle accident, that he was under the influence of alcohol at the time of the accident, and that he lost control of the vehicle and hit a tree resulting in the death of the passenger in his vehicle. (*See id.*) Officer Ouk avers that the Red Notice came to ERO's attention through "DHS record checks," and that DHS sought to confirm its issuance

before disclosing it. (Ouk Decl., ¶ 10.) Officer Ouk further avers that "'[a]uthorization[3] for use of the Interpol Red Notice was received on September 8, 2026," the same day Respondents' return and Officer Ouk's declaration were filed. (*See id.*, ¶ 16; *see also* dkt. # 6.) Nothing in the record demonstrates that ERO was in possession of this document, or even had knowledge of it, at the time of Petitioner's arrest.

Petitioner, in his reply brief, acknowledges the Red Notice and explains that he disclosed the Ukrainian criminal matter in his Form 1-589 Application for Asylum and noted in the application that he had completed the sentence imposed in that matter. (Dkt. # 9 at 6.) Petitioner submitted with his reply brief pages from his Form I-589 which reveal that the basis of his request for asylum is that Ukrainian prosecutors are attempting to prosecute him again for his role in the traffic accident and, according to Petitioner, are seeking to imprison him for the offense for which he has already completed his sentence. (*See id.* at 11-14.) Petitioner also submitted in support of his reply brief copies of what appear to be official Ukrainian government documents confirming that he has completed the sentence imposed for his role in the automobile accident. (*Id.* at 15-17.)

Petitioner was scheduled to appear before an IJ for a master calendar hearing on September 17, 2026. (Ouk Decl., ¶ 14.) The outcome of that hearing is unknown.

## II. LEGAL STANDARDS

The Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., art. I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure

[3] Respondents do not explain what the term "authorization" means in this context.

release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## III. DISCUSSION

Petitioner filed his federal habeas petition on August 24, 2026, and he asserts therein that he lawfully entered the United States in August 2024, was paroled into the country under the Ukrainian Humanitarian Parole program, timely filed for asylum, and was suddenly detained by ICE in August 2026, without being informed of the legal basis for his detention. (Dkt. # 1 at 3.) Petitioner alleges that his continued detention violates the Fifth Amendment Due Process Clause, and he seeks release from custody or, in the alternative, an individualized custody hearing. (*Id.*) Respondents argue in response that Petitioner's petition is ambiguous, that they "cannot reasonably be expected to formulate a meaningful response to every conceivable argument it might imply," and that, in any event, Petitioner is lawfully detained as an arriving alien pursuant to 8 U.S.C. § 1225(b)(1). (Dkt. # 6 at 5-7.)

While Petitioner's claim may not have been presented with the same precision commonly seen in represented habeas cases, the Court does not find it ambiguous. Indeed, the petition presents a claim similar to those presented in a multitude of other federal habeas petitions filed in this District in recent months by noncitizens who, after having been previously released on an order of supervision or an order of recognizance, have had their release abruptly revoked without

any notice or opportunity to be heard prior to the revocation. In other words, a typical procedural due process claim with which Respondents are familiar. Unfortunately, Respondents provided only a barebones response to the petition.

**A. Statutory Basis for Detention**

As noted above, Respondents argue that Petitioner is lawfully detained under 8 U.S.C. § 1225(b)(1). However, the Court need not consider whether there is a lawful statutory basis for Petitioner's current detention. "[T]he fact that the Government may believe it has a valid reason to detain Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process." *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1137 (W.D. Wash. 2025). As the Court reasonably construes the petition here as one challenging Petitioner's re-detention in July 2026 on due process grounds, Respondents' arguments regarding their purported statutory authority to detain Petitioner are irrelevant and the Court need not consider them. *See Sarwari v. Wamsley*, 2026 WL 279968, at *3 (W.D. Wash. Feb. 3, 2026). The Court now turns to Petitioner's due process claim.

**B. Due Process**

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas,* 533 U.S. at 690. It is well established that due process rights extend "to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' . . . interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

While due process is flexible and adequate procedural protections can vary based on the circumstances, *Mathews* 424 U.S. at 334, courts look to the three-part test established in *Mathews* to determine what procedures suffice:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Courts apply the *Mathews* three-part test in the immigration detention context. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022); *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025). While neither Petitioner nor Respondents address this test in their briefing, the Court concludes the *Mathews* framework is properly applied here, and it therefore addresses the three factors below. *See U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) ("[A] court may consider an issue 'antecedent to ... and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief.").

*1. Private Interest*

The Court first considers Petitioner's private interest. The Supreme Court has consistently recognized the significance of an individual's interest in freedom from detention. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always

been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Hamdi*, 542 U.S. at 529 (the interest in not being detained "is the most elemental of liberty interests"). This liberty interest exists even where, as here, release is conditional. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) (collecting cases). A person previously released on parole under 8 U.S.C. § 1182(d)(5)(A) is deprived of that interest upon renewed detention. *See Dieng v. Hermosillo*, 2026 WL 411857, at *3-5 (W.D. Wash. Feb. 13, 2026); *Zavorin v. Wamsley*, 2026 WL 309733, at *3-4 (W.D. Wash. Feb. 5, 2026); *Torres v. Hermosillo*, 2026 WL 145715, at * 3-5 (W.D. Wash. Jan. 20, 2026); *Ramirez Tesara*, 800 F. Supp. 3d at 1136. This factor weighs in Petitioner's favor.

*2. Risk of Erroneous Deprivation*

The Court next considers the risk of an erroneous deprivation and the value of additional safeguards. The circumstances of Petitioner's arrest and detention on August 13, 2026, underscore the high risk of erroneous deprivation of his liberty absent a pre-detention hearing. Respondents suggest that the termination of Petitioner's parole complied with the applicable regulations, in particular 8 C.F.R. § 212.5(e)(2)(i), and they cite to the Interpol Red Notice as justifying the termination. (Dkt. # 6 at 7.) As relevant here, parole may be terminated, on notice, "upon accomplishment of the purpose for which parole was authorized," or when a DHS official with authority decides that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i). When termination is based on the reasons set forth in § 212.5(e)(2)(i), written notice must be provided to the noncitizen.

The parole termination notice issued in Petitioner's case was issued the day following his arrest, but it is unclear when or if the notice was served on Petitioner. (*See* Clark Decl., Ex. 2.)

Assuming the notice was served on Petitioner, the record suggests he may not have received it until August 17, 2026, three days after it was issued and four days after Petitioner was taken into custody. (*See* dkt. # 1 at 6.) And notably, the parole termination notice makes no reference to the Interpol Red Notice, it indicated only that ICE had determined it was “prudent” to have Petitioner’s case heard by an IJ. Neither the notice, nor the record as a whole, reflect any findings by the government that “the purpose for which parole was authorized” has been accomplished, or that “neither humanitarian reasons nor public benefit warrants” Petitioner’s continued presence in the United States. Thus, to the extent Petitioner may have been provided written notice of the termination, the current record suggests such notice was neither timely nor sufficient. “The Government's “failure to follow its own regulations . . . demonstrate[s] a substantial risk of erroneous deprivation.” *Ortega v. Scott*, 2026 WL 1905841, at *4 (W.D. Wash. July 2, 2026) (quoting *Caceres v. Joyce*, 813 F. Supp. 3d 407, 417 (S.D.N.Y. 2025)).

The record also gives rise to questions about whether there was any justifiable basis for the termination of Petitioner’s parole. As noted above, the parole termination notice made no reference to the Interpol Red Notice. Similarly, the Form I-213, which details events relating to Petitioner’s arrest, makes no mention of the Red Notice and, in fact, affirmatively states that no criminal history could be found for Petitioner. (*See* dkt. # 1-1 at 7-9.) Moreover, nothing in the record suggests, much less demonstrates, that Petitioner violated any conditions of his release or failed to appear for any required appointments or hearings. Thus, it is something of a mystery why ERO deemed it necessary to detain Petitioner.

In authorizing Petitioner’s parole into the United States in August 2024, DHS necessarily found that he “present[ed] neither a security risk nor a risk of absconding.” 8 C.F.R. § 212.5(b). Here, ERO officers unilaterally overturned the DHS determination of no flight risk and no

danger to the community for no apparent reason. To detain Petitioner over two years after his entry without first considering those factors posed a high risk of an erroneous deprivation. *See E.A. T.-B.*, 795 F. Supp. 3d at 1323 (collecting cases). Thus, the second *Mathews* factor also weighs in Petitioner's favor.

*3. Governmental Interest*

Finally, the Court considers the government's countervailing interests. There is no question that the government has legitimate interests in enforcing immigration laws, protecting the community, and ensuring a noncitizen's appearance for immigration proceedings. Respondents, however, identify no concrete way in which providing a brief pre-deprivation process would materially impede those interests. Custody and bond hearings are routine, and courts have found the incremental burden modest compared to the risk and consequences of erroneous detention. *See*, *e.g.*, *E.A. T.-B.*, 795 F. Supp. 3d at 1324; *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019). This third factor also weighs in Petitioner's favor.

In sum, all three *Mathews* factors weigh in Petitioner's favor. Given Petitioner's liberty interest at stake, the high risk of erroneous deprivation, and the identified governmental interests, providing no pre-deprivation process was constitutionally deficient. Habeas relief is therefore warranted, and release is the appropriate and constitutionally required remedy.

## III. CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

(1) Petitioner's petition for writ of habeas corpus (dkt. # 1) is GRANTED. Respondents shall RELEASE Petitioner from immigration detention within **twenty-four (24) hours**, subject to his most recent pre-detention conditions of release.

(2) Respondents shall file a status report with the Court confirming Petitioner's release within **two (2) business days**

(3) The Clerk shall direct copies of this Order to all counsel of record.

DATED this 22nd day of September, 2026.

MICHELLE L. PETERSON
United States Magistrate Judge